Yates, J.
The respondents filed their bill as assignees of Edmund Prior, a bankrupt; who, it appears, while a merchant, in embarrassed circumstances, borrowed at different times of the appellant, then his confidential clerk, several sums of money., and gave various bonds and securities tor such loans,
*422 The court below ordered the bonds, obligations and settlements *° set aside, and all the accounts between the 27th of November, 1790, the time of the commencement of their dealings, and the 4th of July, 1801, to be opened, not only on the ground of usury, but also for mistakes and omissions, and for undue advantage taken of the necessities of the principal; and referred the whole to a master, who was directed to allow “ rests,” in stating the account, at the period of liquidation between the parties: that the interest then due should be considered as principal, and that the appellant should be charged with the amount of all the securities assigned to him which had been paid, or which he had refused to deliver to his principal for collection, or which had been lost by his negligence, default, or want of diligence in collecting them, with interest.
The unusual security taken at different times, various in kind and enormous in amount, according to the debt from time to time due and owing to the appellant; the charges made, not covered by the calculation of simple interest, but resort had to compound interest to support them, and other apparent deficiencies, show conclusively, that the acts of the appellant appeared oppressive, and called for a strict investigation. The chancellor, therefore, correctly ordered the special reference to the master as before stated. Numerous cases go to show, that accounts have frequently been ordered to be opened after a longer period than the present: where, as in this case, it appeared that undue advantages had been taken of the peculiar situation of the party. In *Bosanquet v. Dashwood, (Cases temp. Talbot, 37.) usurious agreements were made and repeated from 1710 to 1724. The accounts were ordered to be opened, and the demands reduced to money really lent. So, in Vernon v. Vawdry, (2 Atk. 119.) the whole account was opened after a period of 23 years. The same principles governed the decision in a number of other cases cited by the respondents’ counsel, in the argument of this cause in the court below. (1 Johns. Ch. Rep. 555.)
The accounts, then, having been properly ordered to be opened, and referred to a master, it appears, that on the coming in of the master’s report, six exceptions were taken to it by the appellant; after hearing of the parties on those exceptions, the chancellor allowed the first, modified the fifth, and disallowed the remaining four. This decree, together with the one made the 29th of September, 1815, are the subjects of the appeal now before this court. The second exception is, that the master ought not to have reported that he had ascertained that the appellant took from the said Edmund Prior, before his bankruptcy, without permission, certain securities for the payment of money.
The bill states, that the appellant, while he had possession of the valuable papers of Prior, without the knowledge or consent of Prior, took several notes and obligations, sealed and *423 unsealed, belonging to Prior, which were never assigned or delivered to the appellant; and among other things, prays, that the appellant may be charged with the amount of all notes, bonds, and obligations wrongfully taken or detained by the appellant, and of all those assigned to him which, from his negligence or default, became precarious.
It does then appear, that the relief sought with regard to those securities, is not, as urged by the appellant’s counsel, on the sole ground of the debts having become precarious from the negligence or default of the appellant. It is also grounded on the liability of the appellant to be charged with the amount of those notes, occasioned by his wrongful act in taking them, without the knowledge or consent of Prior; and the directions in the decretal order, referring it to the ^master, required him to make the charges according to the prayer of the bill. The master, therefore, correctly reported, that he had ascertained the fact, that the appellant had taken securities belonging to Prior without his permission.
It is alleged, in the fourth exception, that the master ought not to have reported as he did with regard to the balance.of $190, due, on the 16th of September, 1796, on Seaman and Avery’s note; and in the 6th exception, as to ¾>81 and 44 cents, the amount of David fionium's note. It cannot be questioned, but that those two notes were unassigned and unen-dorsed when taken out of Prior’s possession by the appellant, because he expressly admits it in his answer. The correctness of the chancellor’s decision, in disallowing those exceptions, must consequently depend on the truth of the alleged facts, that those notes were taken without Prior’s knowledge or permission, and that the payers were solvent on the 4th of July, 1801.
The testimony authorizes the conclusion, that the notes were taken as alleged in the bill, notwithstanding the denial of it by the appellant in his answer. Edmund Prior, to whom those notes at that time belonged, testifies, that they were taken from his possession without his knowledge or consent; and when he missed them, in March, 1801, the .appellant refused to give him an account of them. That a number of notes were taken out of the desk of Prior, and that the appellant refused to give a list of those securities, are facts strengthened by the testimony of William Prior; and as to the demand and refusal, that is fully confirmed by Robert Bourne. This alone would be sufficient to show the nature of the transaction: but in addition to those facts, taking into view the improbability that such permission should have been given, from the circumstances, that neither of the notes in question was endorsed or assigned; that no account had been kept of them, which must have been known to the appellant when he refused to give information to Prior, by furnishing him with a list of them, must be sufficient, in opposition to the answer, to *424 establish the fact, that the notes were taken without the pre-vi°us knowledge or consent of Prior,
*liy the 18th article of the first agreement between the parties, it is stated, that the appellant is not liable to pay the amount of any of the securities mentioned in the answer, the Pa)?er °1' which was insolvent on the 4th of July, 1801 ; the appellant, however, is to account for any sums of money he may have received as dividends upon the estate of such insolvent payer.
The testimony show's conclusively, that David Barnum'’s note is not excluded by this article in the first agreement, as his solvency after the 4th of July, 1801, cannot be questioned; and it is equally clear that the appellant ought to be charged with the amount of this note.
Prior and Barnum both state, that in the autumn of 1801, Barnum called upon Prior to pay off his note ; and finding that Prior had. it not in his possession, Barnum refused to pay it. The wrongful taking of this note, therefore, out of Prior’s possession by the appellant, caused the non-payment, and consequently the loss of the debt, and that was sufficient to render him liable. The statement in his answer, that in 1801 he made a personal demand upon Barnum, who refused to pay, on account of notice from Prior not to do it, cannot be relied on, because Barnum, upon his examination, confirms what Prior says, and contradicts the appellant’s statement. He says, that he remembers the offer to pay Prior, and his refusal, on finding the note could not be produced; but he has no recollection that the appellant had applied to him personally for payment, or that Prior ever forbade him not to pay the note to the holder.
The appellant had misconducted himself, and the assignees were not obliged to accept the tender of the note made to them in April, 1802. Admitting that Barnum was then solvent, they had a right to look to the appellant for the debt; and I can see no reason why he should not be charged with the whole amount of principal and interest due on the notes.
The note of Seaman and Avery is also not endorsed nor assigned; and the appellant states/that Richard Seaman, one of the payers, died insolvent before it came into his hands; and that Elijah Avery, the other payer, also died insolvent, shortly after the note came into his hands ; that he cannot %tate the particular times when the unendorsed or unassigned notes were taken by him; but that the whole of them came into his possession between the date of the third assignment, which is stated to be the fourth of February, 1799, and the 10th of June, 1801. Elijah Avery must have died before the 9th of September, 1802; because on that day administration was gran ted on his estate. The appellant admits the note to have been in his hands before the 10th of June, 1801, and from the testimony it is evident that Avery was solvent at that time, and *425 remained so until his decease; for by the proceedings of the Probate Court of the district of Rutland, in the state of Vsrmont, it appears, that on a settlement of his estate, there remained near $900 for his children, after paying all the expenses to the guardian for adjusting and managing the estate. Amam Paine wrote, according to the information he had obtained as late as October, 1804, which he no doubt believed to be true, that Elijah Avery died insolvent, and that nothing could be obtained from the estate. It might have been so reported at the time ; the fact, however, is otherwise. Avery was solvent on the 4th day of July, 1801 ; so that this note is not excluded by the 18th article of the first agreement, and the appellant is liable for the amount, on the principles before stated with regard to Barnum’s note.
The fifth exception is, that the appellant is charged as of the 18th of December, 1798, with 6,114 dollars, as, and for the balance due on Samuel Beman’s bond, assigned to him by Prior, and which bore date the 11th of April, 1795. This balance was modified by the court below, and reduced to the sum of 5,352 dollars, as of the 1st of September, 1802. The above-mentioned bond of Samuel Beman, was for 2,055 pounds, and had been assigned to the appellant on the 4th of February, 1799, as a collateral security of the debt due from Prior to him. It is urged, that he is chargeable with the amount of the balance due on it, for improperly refusing to accept of offers made to him of lands in payment of this bond, whereby the debt became wholly lost.
It appears that in June, 1802, Beman, by his agent Melanc-thon Wheeler, made an offer to the#appellant of a tract of land containing 1,338 acres, lying in the town of Hampton #in the county of Washington ;■ which, in Beman’s opinion, was worth four dollars per acre, and, also, of a tract of 800 acres, lying in Clinton or Essex, at the valuation of men, to pay and satisfy this demand; and that Wheeler, at the same time, told him, that Bern,an declared himself unable to pay the demand, unless the appellant would receive payment in lands. Wheeler says, ho does not know what title Beman had to the lands, nor does he recollect that he ever conversed with Prior, or any of his assignees, in relation to the offer of lands to the appellant. That the appellant declared he could not accept the proposal, since he held the debt as a security for a demand he had against Prior. Wheeler further states, that John Williams held a judgment, by assignment from one Mitchell, against Beman, and that he heard Williams declare he would release those lands from the effect of his judgment, for the purpose of relieving Beman, provided his creditors would accept them in payment of their demands. This differs, in a material point, from Prior’s statement. He does not say that Williams offered to release on that condition, but that Williams applied personally, in behalf of Beman, to him. and wished to settle the bond by *426 giving a certain portion of Bernan’s land, on which he had a prior judgment in satisfaction of the debt, and offered to release the land from the judgment; that he (Prior) consented to it, but the appellant refused, and with the assent of one of the assignees, he offered that the assignees, according to the best of his (Prior’s) recollection, should indemnify him against any loss, upon a fair sale of the land ; but the appellant would not consent. Bernan also states, that in the spring of 1802 he wrote to the appellant, and offered him about 3,000 dollars worth of land, and 2,000 dollars in obligations; or if he would wait for his pay ten years, he would pay the whole of the bond, which proposition the appellant also refused to accede to.
There can be no doubt, that those offers were made ; but I cannot discover the grounds upon which the appellant is to be made liable for the balance due on this bond; his refusal to take the lands in payment, or to accept either of the propositions made to him, could not create such liability. The bond was assigned to him as collateral security; #and it cannot be questioned that his debt, at the time those proposals were made, far exceeded any amount those lands could be fairly appraised at. And although he might have had other securities for what was due him, yet he had a right to prefer either of them, and insist on payment according to the condition of the bond; and as Prior and the assignees both had notice of the offer, they might have paid him the amount due on it, and have taken the lands, if his refusal endangered the debt. The offer of one of the assignees, and according to the best of Prior’s recollection, made in behalf of the rest, to indemnify him, did not make it obligatory on his part to comply with Bernan’s proposal.
I have thus placed the question with regard to Bhinelander’s conduct, on the broad ground of legal right in him to do as he did. But it is extremely questionable whether, in the exercise of reasonable discretion, his conduct, in this instance, ought to be viewed as perverse and unconscientious. It must be recollected that Bernan was much embarrassed in his affairs, and that there were several judgments against him at the time, and that some of them were not wholly satisfied. That after the bond was given, and before he assigned it to the appellant, Prior himself had included the amount in a judgment bond he took from Bernan, of which it seems he was not unwilling advantage should be taken, as appears by his letter of the 29th of March, 1802, to Bernan, after Beman had been sued on the original bond. He states, that he thinks B. may availingly plead the bond and judgment taken by P.; that it being of higher authority, he supposed it would furnish B. with a sufficient plea to place him in security respecting it.
This shows, that all the parties concerned did not consider the appellant as having the absolute control of the Beman debt. It would have been resorted to as a shield to protect Beman *427 at law. The letter from Zebulon R. Shepherd, to William N. Dtjkman, admitted as evidence by the consent of both parties, ... . . shows that Reman contemplated to make use of it in his defence. Slupherd says he knows that a suit was brought against Reman, in the name of Prior, which Reman supposed to be bottomed on a bond assigned to Rhinelander, and that a statement was shown to him in #the hand-writing of Prior, proving that the bond had been merged in a judgment to him, as trustee from himself and other creditors; that Reman designed, in the outset, to defend, on the ground that the judgment extinguished the bond; but, soon after, concluded to be prosecuted by his friend, John Williams, as a bankrupt.
From the whole of this, it is evident, that the appellant was justified in not assenting to the arrangement proposed; and the correct course would have been for the assignees, who must have known the true situation of the debt, to have paid him the amount of the bond, and thus to have taken the risk of the compromise upon themselves. This they did not think proper to do, and it would be unjust that the appellant should now be held responsible for the balance due on it.
In addition to what has been shown, there is another view of the case, from which it is clear that the appellant ought not to be deemed liable. It seems to me, that the facts disclosed warrant the inference that Reman was insolvent on the 4th of July, 1801 ; and if so, it brings the debt within the agreement of the counsel already mentioned, by which it is stipulated, that the appellant shall not be liable to pay the amount of any of the securities mentioned in the answer, (of which Bernards bond is one,) the payer of which was insolvent on that day.
Zadoch Wheeler, one of the firm of “ Scott, Reman & Wheeler,” testifies, that he was acquainted with the affairs of Samuel Reman on the 4th day of July, 1801, and he then thought, and still verily believes, that he was then insolvent. Prior P. French testifies, that he was well acquainted with Samuel Reman at that time, and was a near neighbor to him, and had frequently, as well before that day, as often after, heard him converse about his circumstances and affairs; and from those conversations, as well as from general report, he understood, and was informed, that Reman was insolvent on that day, and for a considerable length of time before ; which information he then believed and still believes to be true. That he was informed by Pliny Adams, since deceased, the sole assignee of Reman, that he never realized any thing from his estate. Reman himself declares, that the persons ^composing the firm of “ Scott, Reman & Wheeler” were insolvent on the 4th of July, 1801 ; but exonerating him from any liability to pay the debts of the firm, he should consider himself to have been able, if his creditors would have received his property at a fair valuation, to pay all his just debts on that day, and thus far considered himself solvent; but that he was not, at that time, *428 able to pay all his just debts, including those of Scott, Beman lY Wheeler ; and that after the sale of his land upon execution, on the judgment in favor of Williams, he had no lands remaining, except the equity of redemption as to the lands in r, n 1 1 J 1 Vermont.
It appears to me, that the testimony is conclusive to show, that Samuel Beman was insolvent on the 4th ol July, 1301, and I can discover no solid reason, why this is not a case within the meaning of the stipulation entered into by the parties. Admitting that the provision in the agreement was intended to meet a charge of negligence, and to afford a test of the absolute inability of the parties to pay, at a given time, the refusal to accede to the offer of payments in lands from a person in the embarrassed situation of Beman, could not render the agreement inoperative. The appellant, in the exercise of sound discretion, refused to accept of the offer, and was not called upon to object to the title, although the case shows that it must have been extremely questionable; and that alone would authorize a rejection ; so that, in fact, the refusal of it was a sufficient objection to the title.
Upon the whole, my opinion is, that the appellant ought not to be charged with any part of the balance due on Samuel Beman's bond, dated the 11th of April, 1795, assigned to him by Edmund Prior, on the 4th of February, 1799. That, consequently, the decree of his honor the chancellor ought to be reversed, as far as it relates to that bond; that the cause be remanded, so that the decrees and decretal orders in the court below may be modified, and carried into effect accordingly.
This being the unanimous opinion of the court, it was thereupon ordered, adjudged and decreed, that the decretal #order of his honor the chancellor, made in this cause, be in all things affirmed, except so far as relates to the fifth exception taken to the master’s report in this cause, on the part of the appellant, and which relates to the balance due on the bond of Samuel Beman, mentioned in the pleadings and proofs in this cause. And it is further ordered, adjudged and decreed, that the said fifth exception be allowed as well taken; and that the decretal order of the Court of Chancery, so far as the same orders and directs the debt due by the said Samuel Beman, or any part thereof, to be charged to the appellant, and to be allowed to the respondent, in taking the account in the cause, be reversed; and that in stating the account between the parties in this cause, the appellant is not to be charged with the debt or bond of the said Samuel Beman, or with any part thereof: and that the record and proceedings be remitted, &c.